I might say I have the same problem with your brief in that you cite Cal Jacks and the reporter's transcript, but I didn't see in the excerpt of record. I'm taking that to heart. You see what I'm saying? Maybe the judge gave Cal Jack and maybe the judge didn't, but I have no idea from the transcript. So I just again mention with some pretty basic rules here in the Ninth Circuit, if you are citing to an actual transcript, we need to have it. Yes. And we do go to the trouble of getting the district court record, but then we have to hunt through the whole record to find something. So I'd appreciate it in the future if you're going to cite to anything that you provide a copy. Yes. Thank you. Thank you. We also had the problem with the double-sided copying, which I apologize for. California rules required double-sided. Ninth Circuit requires one-sided. That one got worked out. Did you receive a call from anybody in the Ninth Circuit asking you to supplement your excerpts of record by the transcript? I was driving through central Florida about ten days ago when I got a call from ñ I was on vacation and I did get a call from your staff. What action did you take? When I got back, the problem had been resolved. I was told that the staff had found the opinion to resolve the double-sided problem and that there was a jury instruction, which the people, the respondent, are relying on. We're really pointing to the absence of another jury instruction. We're not really relying on the one that was given. But at any rate, that one was forwarded to the court also apparently by someone. I had three conversations altogether with the court staff about this. Kennedy, you weren't the attorney who said to the staff member, I don't have time for that. I beg your pardon? You're not the attorney who said, I don't have time for that. No. No, I ñ Well, we'll get to the other side and ask the same question. Okay. Today I would like to focus on the second argument in our brief, which has to do with the exclusion of testimony of an examining psychologist, which was offered by the defense to demonstrate that the defendant was mentally retarded. In the absence of expert testimony on his ñ on the issue of mental retardation, the jury was left with insufficient ñ an insufficient basis to conclude that he was retarded. He made a fairly competent witness. He responded in complete sentences. He claimed to have been in homes for the retarded, but he was tripped up on the dates and there's no way to know if the jury even accepted that. He was substantially impeached on a number of details, and so he could have been impeached on his claim of retardation. He claimed that he was given medication. Well, couldn't counsel have had this expert examine the client right at the time of the trial or something like that to bring it up to date? The expert examined the defendant two and a half years prior to the offense. I know, but why couldn't defense counsel, which I think was not you, but defense counsel could have had the expert examine the client right on the eve of trial and brought it up to date? If it wasn't that possible. It could have been done. But it wasn't done. The issue today is not what could have been done, but what was offered. And ñ I was just looking at the practical side. It would have been very easy. It would have been very easy. Then you wouldn't have had an issue to raise. It would have been very easy. But it didn't happen. Now, I'd like ñ yes. You are proceeding on ineffective assistance of counsel. We're not. One of the ironies of the situation that I have here is that what we usually do is go out and hire a doctor to meet the defendant, a forensic psychologist who does the evaluation for the purpose of defending the crime that has been committed. The doctor is well paid. The doctor knows what we want him to say. He usually testifies to what we want him to say. And the prosecution predictably says to the jury, well, this evidence was basically prepared for the purpose of this trial. Wouldn't it be a lot better if we had a doctor who'd examined the defendant a couple of years ago maybe before any of this came up? Then wouldn't we have a much better idea that we were getting the truth? Isn't that better evidence? And I hear that. That's what I hear in response to the case that I more typically present. So now, in a comparatively rare case, we actually have a doctor that examined the defendant when he wasn't charged with anything, when there was no question of criminal liability. But under the Von Arsdale case, the Supreme Court has held that as to issues of relevancy of expert testimony. The trial court in the State has discretion to determine whether fundamental relevancy has been proved. What the judge said was you had a 1997 examination by Dr. Williams. You haven't had the person examined since then. We don't know what kind of training or what kind of progress, if any, or regression has occurred since 1997. I don't find that an examination made in 1997 provides sufficient certitude to allow an opinion to be expressed to the jury. This is a habeas case. This is an AEDPA case. Tell me, why is that an unreasonable application of a Supreme Court opinion? That's plainly unreasonable because, and this is a matter of common knowledge, that people that are approved for regional center services and SSI benefits don't get evaluated every year or every two years or every three years. They get evaluated and they may remain on the program their whole life without being reevaluated. The reason is because these conditions are chronic and stable and unchanging. Now, there may be a realm of magical thinking where these things get better. But, in fact, they don't. And it's unreasonable to speculate that they did. Now, as for the point about social cues, that maybe he was trained, remember, the prosecution did not complain about late notice. This holds as a matter of law that a psychiatric opinion in 1997 that this man was mildly retarded is a finding that this man will never get better and never adopt socially any better. And it would be unreasonable for the court and the trial court to say that's not relevant because what I'm interested in is what was his condition in 1999. There's no reason for a trial court to say that. Is that your position? No. All I have to show is that it's relevant. I don't have to show that it's the gospel. All I have to show is that this jury should have known this. No, what you have to show is that the trial court in California said when it said this is irrelevant, it was making an unreasonable application of Federal law as found by the United States Supreme Court. And it's excluding, it was excluding relevant evidence on an unreasonable basis. You're begging the question by saying it's relevant. What you have to do is to show that this judge was acting unreasonably, didn't have any reason for finding it to be irrelevant. Okay. Let me go down the road a little bit with this, because the court just pointed to the reason, the primary reason he was giving is that, well, maybe there was training on social cues. Now, normally, if I was going to contradict, if I were the prosecutor, I was going to contradict this. I have the report. I would have gone out to the regional center and tried to rebut this, tried to show that he actually got training. That wasn't done. So, therefore, the objection only goes to the weight, not the admissibility of it. But to get to a more fundamental level, if you examine closely the questioning of the judge to this expert, he was asking her whether the defendant might have gotten training on social cues. In other words, you enter a room and everybody's standing in a line. So you stand in a line. You're out with a girl, and she bunches up her face or holds her knees together. She probably doesn't ‑‑ she's giving social cues, or body language was the word that the judge used, to indicate a lack of consent. Now, the testimony about Deanna was that she doesn't speak for herself. She never voices an objection to doing anything. And this is a quote by the examining psychologist. She is not able to conceptualize, to provide consent. The idea of consent doesn't exist for her, unquote. Deanna is compliant. Her desires, quote, don't seem to enter into the picture, unquote. So this is the description we are given of Deanna. She doesn't give social cues. The judge was trying to determine whether the defendant might have an enhanced ability to pick up on social cues. But this was not what she was capable of communicating. In order to determine her ability to consent in this situation, the defendants had to reason a little bit more about the context. What was she doing out on the street at night? Who was she? Was she a prostitute? Where did she come from? They were supposed to probe with some questions. And the Iverson jury, the codefendant's jury, recognized that and asked about that. They were given more instructions, and they failed to reach a verdict. So it was plainly, highly relevant to this guilt determination to know whether this defendant could reason through, forget about the social cues for a moment, how was she dressed, where were they, where did she come from, what did she do for a living, engage her in conversation. That's what a competent person would do to determine whether she could consent. What's your best Supreme Court case that says that it was unreasonable for the California courts to follow this? Well, let me say, number one, that I think I would be hard-pressed to find in California or anywhere in the United States a case in which the defense offered an expert psychologist who had examined the defendant prior to the offense and that that was excluded. So I don't think I'm going to find many of those cases. But I do have a number of Supreme Court cases which come up in the context of either appointed psychologists or psychiatrists or ineffective assistance of counsel to pursue the appointment. And there's about five or six of those that are cited in the brief. Wiggins v. Smith, Rompilla v. Beard, Aikin v. Oklahoma, they all discuss the necessity of an expert psychologist.  in those cases if the evidence weren't relevant. I don't think they would have gone to the effort to crucify the defense attorney in those cases if the evidence weren't relevant. But, you know, if it were an ineffective assistance of counsel case, there would be two parts to it, of course, whether there was ineffective assistance and then the prejudice. My question, again, in trying to see what the testimony was, I have to rely on the brief because I don't think I have it in the excerpt of record in terms of the actual testimony. There were hundreds of pages of testimony about this.  I'm starting to get it. This needs to be a larger document. Well, you know, because the argument you're making, I am troubled, you know, given the length of the sentence and other things in this case. But if you try to look at it through the lens of an ineffective assistance of counsel, you do come back to a prejudice issue as well. And so I'm reading, haven't read the whole transcript. I don't have any excerpts, but I have a summary in your brief. And we do know that he was on SSI. We know he was in hospital right up before the crime, that he was hearing voices, that he had various mental problems and that sort of thing. And so we know that he said some of that. Okay. And the, believe me, the district attorney did not take any of this for granted. She actually told the jury that he was normal. She told them that he was normal. Well, did the jury hear about the fact that he was hearing these voices and all that? He said he was hearing voices. He testified. He said he was hearing voices and that they prescribed him Zyprexa. And that he lived with. And if you know what Zyprexa is, I think you're way ahead of the jury. That he had lived with mentally retarded individuals and that he thought she was like some of those individuals. Yes. So I guess, you know, what I'm trying to get at to try to put it all on the table of analyzing it, because I think as to whether, you know, in general, of course, evidentiary rulings aren't the kind of grist of a winning habeas appeal, but to the extent it's the essence of your defense and goes to an actual element of the crime. True. You know, then it kind of transforms itself to somewhere between an evidentiary and something else. True. But I'm trying to figure it out whether, in fact, they had enough other evidence to make a judgment about his abilities and about her situation. All they had was the defendant's testimony. And he speaks in complete sentences. And for all this jury knew, he was just a flim-flam man that, you know, was claiming all these things. But where was the proof? There was, other than his testimony, there was no proof that he was retarded. There was no proof that he was an out-of-the-regional center client, which is a big deal. Didn't the judge make his finding that Dr. Williamson, in 1997, had not assessed the defendant's ability to read social cues from other individuals, which was the whole basis of his defense? That betrays a basic misunderstanding of the issue that was before the jury. The jury was not being asked whether Deanna gave off social cues. A normal person could give off social cues without verbalizing lack of consent. The victim could cry. The victim could run away or do different nonverbal things. The thing about Deanna is that she doesn't do any of that. She's quiescent. She goes along with whatever someone else is doing. And that was the people's case. That was their case. Their psychologist, examiner, their care provider came in, testified to the same thing. So she's not giving off social cues. Did the defendant raise an issue about his capacity to commit the crime, per se, that was not presented to the jury, was it? Well, he testified. I know what he testified to, but did he ask for a jury instruction saying if he lacked the mental capacity to commit the crime, then he should be acquitted? That's essentially what it amounts to, is what you're saying here. That would have been a good idea, too. I agree. And it wasn't asked. You don't claim ineffective decisions against him. No, I'm not claiming that. It's just what was offered. It was just what was offered. Look, this district attorney got up and argued to the jury, you know, we don't have any evidence that he was retarded. Maybe in 1997. Why 1997? What does 1997 have to do with anything? That was when Williamson examined it. The jury hadn't heard from Williamson. So she was arguing against Dr. Williamson's testimony as if Williamson had testified. And that may give you the impression, you know, that there was evidence that he was retarded. But there wasn't. She was just, I don't know, arguing against a straw man. There was evidence that he had mental problems. You could believe or not believe him, but there was definitely evidence in the record, correct? Well, okay. He said he had lived in a home for the retarded. He was asked whether he had been diagnosed as retarded. And guess what happened? Objection. Hearsay sustained. So we don't know. He wasn't even allowed to testify that he'd been diagnosed as retarded. So was he psychotic? Was he retarded? Was he developmentally disabled? Was he organic brain damage? Nobody knows. This jury didn't know. They didn't know whether he was just marginal or whether the extent of his retardation. And that's what they had to know. And any information about social cues would not have helped. The argument then would have been, what difference does that make? She didn't give off any social cues. That was truly irrelevant. But the evidence that he was retarded, that he wasn't able to take in the whole situation, evaluate how she was dressed, the time of day, what was she doing there, what did she do for a living, where did she live, et cetera. All of that information that a person of normal mental competence would put into the stack before they had sex with somebody, his ability to assess that and process that was impaired. Anybody that was told that he was retarded would know that. The Iverson jury drew that connection. Iverson wasn't even retarded. So the prejudice, I think, is manifest on the record. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. I'm Mark Johnson from the California Attorney General's Office. On behalf of Respondent Pelley here, let me first start with these questions regarding the record and so forth. And if the Court has some questions, I'd be happy to clarify what went on before. We were told that the staff requested transcripts and instructions that you were relying upon, and you or someone in your office said, I don't have time to send it to you. Okay. Is that right? It's partially correct. Even if it's partially right, aren't we entitled to an apology? Your Honor, let me explain what happened, and I think you'll understand. Okay. First, I pointed out in my brief here on page 9 that the, that the, insofar as the State Court opinion, I pointed out in my brief that it was incomplete, that it was missing the even or odd pages, depending on what it was. I footnoted that. I was under the impression at the time, and I explained in my footnote, that I thought perhaps it was just my copy of the excerpts of record that suffered from that defect. And if that was the case, I had no objection, because I did have a copy of the record that I could work with, but that if it was a, the defect was also in your copy, I had no objection to Mr. Bonneau filing a supplemental one to include it. Then I got a phone call, I believe about 10 days ago, from a clerk in the Court, I believe her name was Mimi, and she asked me about the, the, the, this opinion, and she also asked about some, some jury instructions. And she asked if I, and I said, okay, I can tell you where to get them on Westlaw, well, okay, the jury instructions. All right. You told the clerk she could go on Westlaw and get the jury instructions? No, no, no, no, the, the State opinion. I thought it might be easier for her just to download it. Even that. So your idea was that you would tell the clerk she could go on Westlaw and get the opinion there, rather than the State providing the opinion? No, and I did. So what, what did you precisely say? I told her that it would be easier for her to do that, because I didn't believe I had the record and I would have to track it down. And then, but then I told her to call my secretary. Why wouldn't you go on Westlaw and provide that? Well, I did. This is what I'll, because she asked for the, the jury instructions as well. And so I, I got the information that she said she wanted, and I passed it along to my secretary, and my secretary sent what was requested. Then later, apparently the, the clerk called somebody else in my office, my supervisor, who was unaware of what was going on with this, and asked for these same records. And my supervisor said, I don't think this is our burden to provide this stuff. I think it's the, the burden of appellate. He didn't know about these prior conversations and what had gone on. Now, what, what turned out to be the case was that the instructions that, I believe her name was Mimi, had asked for and that we had provided weren't, didn't turn out to be what she actually did want. So what I did at that point was I went and tracked down our State record, which took some time. These documents are in storage. And, and my secretary did copy the, the jury instructions that, that I guess she turned out she did want and transmitted them to the court. And I, I think that you have them now. Is that the case? This, so this is my understanding of what went on here. You were asked to, your position was that the instructions were adequate, right? Pardon me? Your instruct, your position was that the instructions were adequate. The instructions weren't included in the matters which you had filed. The clerk asked you to provide the jury instructions that were given by the trial court. And that we did provide them. And you didn't have time to provide them. No, no, that, Your Honor, I didn't say that. Your supervisor said that. Yes, that was not me, Your Honor. That was your supervisor. That was my supervisor who was taking this call full and he had no idea about my previous conversations and what was going on with the case. Does your supervisor, do you think the supervisor was correct in making that response? In a technical matter, it is the, the Petitioner's burden to bring this. In a technical matter. This is an appellate court with technical rules. What do you mean by technical rules?  It doesn't make any difference. He should know what the rules of the court are. If you're asked to provide something that you argue, you're to provide it. He, but, Your Honor, he didn't know what I argued. He didn't, I, he didn't suggest that. Then he should say I don't know what he argued, but he shouldn't answer as he did. You can tell that to Mr. Farrell.  But, Your Honor, but, I mean, you didn't provide it. Now, do you want to get on to the substance of this case? Sure. Apparently, the plaintiff weighs his first point. Do you want to talk about the second point, the psychiatrist? I believe that the, as Your Honor pointed out, this is an ADPA case, and I think that the court here was certainly well within its discretion under California law in, in excluding this evidence, and that was reasonable, it was not unreasonable in light of any clearly established Supreme Court precedent. And if you have any further questions about that, I'd be happy to, to answer them. But this evidence was, in fact, if relevant, barely relevant at all under California law, because as the Court pointed out previously, this, the issue in this case was not whether this victim had consented. The issue was, was whether the, the victim had the capacity to, to give consent and whether the defendant knew or reasonably should have known of that incapacity. Look, isn't that based upon whether he was mentally retarded or wouldn't have been able to conceive of it like an ordinary person? It's an objective, reasonable person, standard, Your Honor. And let me, and, and for the Court's benefit. So a mentally retarded person doesn't have any better shake on that than what, what a reasonable person. Possibly in this circumstance. And, and what I want to explain briefly, as a matter of, Judge Siler, Judge McKeown? McKeown. McKeown. And Judge Bea may know this a little bit better, more familiar with California law, but the defense of diminished capacity was abolished in California some time ago. And there's an exception to that, so-called diminished actuality, evidence of diminished actuality can be used in certain contexts when, when the defendant's intent is at issue. And arguably, a case like this, which involves a knowledge component, would encompass that, that sort of evidence. But under California law, it's not a matter of capacity. No longer exists to in any way mitigate intent or anything like that. No. The evidence has to pass a diminished actuality standard. In other, in terms of this case, the, for the defendant to have presented a defense based on his retardation or brain damage, or whatever be the case, he would have had to show that this disability actually prevented him from being able, made him incapable of perceiving that his victim was unable to consent here, which is an incredibly high threshold. And the proffered evidence, even if it had been contemporaneous, would have been woefully insufficient to meet that standard. But it was not contemporaneous. It was based on old data that didn't, that didn't embrace the issues in this case at all. It didn't. Scalia. Did Dr. Williamson say that he had, he lacked the ability to form this intent even in 97? Or anything of that nature? Phillips. No. No. The doctor wasn't asked about that. So far as I can tell, and let me confess to you here, I was not the attorney who handled this case on state appeal. The doctor wasn't asked about whether on this occasion the defendant actually did not understand what was going on with diminished actuality. I agree with you there. Yes. But the reason the doctor wasn't allowed to testify to that was because there was an objection that she had insufficient foundation. Well, and when I'm talking about whether the doctor was asked about this, I'm talking about what the doctor did testify to at this foundational California Evidence Code section 402 hearing, where all of these issues were hashed out before the trial court in making a determination. She testified that she was, she thought that based on her 1997 examination, she would be able to express an opinion as to whether on this occasion this defendant did not have appreciation of the circumstances. No. In fact, she said just the opposite, that she would not be able to make a determination as to how the defendant would, had functioned. Correct. And you say at page 16, she specifically stated that she would not be able to give an opinion as to whether or not the Petitioner had mental awareness or capacity at the time of the crime. Yes. No citation to transcript. No transcript provided. Your Honor, I'm taking this from the State court opinion, which is the one that's being cited. Well, then you should cite to the State. I mean, you know, you did not. Do you want to look at page 16? Okay. And we have a brief with all kinds of arguments and you have statements that people made without a citation. The last paragraph on page 16. Oh, I see. That's not a single citation. I see. Yeah, I should have cited to the AER. Can you give us one now? Yeah, I should have cited to the AER. I'm citing to the section of the State court opinion cited in the previous pages. Can you give us one now? Give us a citation. Yes. The AER sections, what I have here is AER pages 32 to 35. Which is the State court record. Okay. That's the State court opinion? I'm sorry, yes. That's the State court opinion. All right. And unless you have any further questions, this is, as I pointed out in the brief, this appears to be simply a question of the State court's application of State law here. Well, but let's go one step further. The State court opinion says that the defense doctor said that you could not make an opinion as to the mental capacity at the time of the crime. Now, if that was a determination which was an unreasonable determination, as a matter of fact, under 2244d2, right, then perhaps Habeas should issue. Was there any evidence in the transcript that you provided as to what Dr. Williamson said? In regards to what? In regards to what you've just cited me to. In other words, do we have a transcript of Dr. Williamson saying I could not offer an opinion as to his capacity at the time of the crime? In the excerpts of record? Yes. No. I'm taking my factual findings from those of the State court. Well, but step back, Mr. Johnson. Did the State court have any basis to make that determination? Based on its review of the testimony of Dr. Williamson. I'll try again. Where is the evidence that the State court relied upon in making that determination? It's in the reporter's transcript. And where is the reporter's transcript so I can see it and be satisfied that the State court did not make an unreasonable determination of fact? I did not include that in the excerpts of record because I don't believe there was any evidence that the State court's factual findings were incorrect. All right. Because there was no claim under 2244d-2 that this was an unreasonable determination. Yeah. Or under 24. That's an answer. Or under E, Your Honor. Or under E that the factual findings are incorrect. So it's. That's, yeah. So you're taking these as correct because they haven't been challenged. Yes. And therefore, on that basis, you then make your legal argument. Yes, Your Honor. And here's what the facts, if we take the facts as correct, is that she had no information about these matters. She stated explicitly that she had no opinion about defendants' ability in October 1999 to make social cue assessments. And then that's what the State court record says. Then you say that Dr. Williamson specifically stated that she would not be able to give an opinion as to whether or not Petitioner had such mental awareness or capacity at the time of the crime. And you're referring back to legal consent to sexual acts. We don't have any evidence of any such statement, do we? One thing. I'm taking that from her discussion about social cues. And. Well, that's two different things. It's two different things. I mean, that's what we've been trying to unpack here in your comment to Judge Siler is, you know, we don't have diminished capacity, but we have diminished actuality. And what we have in this case had to do with the ability to recognize the social cues. I mean, that's your argument. But now you're actually going further and saying on page 16, he did not have mental awareness or capacity to recognize that she did not legally consent to the act. That's his claim. And then you say, well, she specifically stated that. She didn't. We don't have any evidence that she stated that, do we? Not before you. And I apologize if I've overstated my case. But be that as it may. Well, it's not really be that as it may. I still don't see this as creating a constitutional problem at all, because as the State Commissioner could have gone and sought a contemporaneous examination if he wanted to present evidence specifically in furtherance of a diminished actuality defense, and he didn't do so. Had he done so, that might have made this Dr. Williamson's testimony relevant, perhaps. Perhaps it may have given some basis for offering it in the first place, or it may have obviated it. And I do want to point out that had such a contemporaneous evaluation of the defendant been conducted at that time, the people could have and almost certainly would have conducted their own mental state evaluation. Once the defendant had chosen to place his mental state at issue, and if you needed the – there's a California Code of Civil Procedure, Section 2032.020, that specifically provides discovery in exactly these circumstances. So the defendant could have done this. He didn't do it. We're not arguing an IAC claim here. We're arguing whether the exclusion of this specific evidence amounted – was so egregious as to deny the defendant a right to present a defense in terms of the Federal Constitution. And the answer to that is no. The defendant certainly could have provided relevant evidence that would have addressed the Court's concerns here. Do you have any further questions? If you'd like, I'd be happy to briefly, with the remainder of my time, discuss the instructional claim as well, if you have any questions regarding it. It appears there's no further questions. Okay. Thank you, Your Honors. And if there was any confusion regarding submitting these records on the part of anybody in my office, I do apologize. I know I'm almost out of time. Can I have – You have a minute for rebuttal. Thank you. Add to your time here. I will offer to the Court a supplemental excerpt of record. I can include Dr. Williamson's testimony. I don't have it. There have been gaps in the representation getting the case to us. I will add to this point whether – Was there an offer of proof made that, if allowed to testify, Dr. Williamson would have testified that she did have an opinion as to the defendant's diminished actuality under a probate code – I mean, Penal Code 25 through 29? She – no. She didn't have an opinion about – She didn't know anything about the offense? She didn't have an opinion as to that. Why would her testimony be relevant? This jury had to know that this person was retarded. No. Retarded is not enough. That's like saying she had to know that the person had some disease or it was not normal. The testimony has to be specifically to the point that at the time of the commission of the crime, not that there was diminished capacity, because that's not – by popular referendum in California, that's been eliminated, but that he wasn't able to appreciate the nature and quality of the act because of a specific mental disease. That would be a perfect case, and I've put on cases like that many times, and so I know what – I know how to do it, but – But if she didn't testify, I can't give that testimony. This is – no, she didn't. And did counsel say, let me examine her outside the presence of the jury in a 402 hearing to produce that hearing, that testimony? Yeah. She did testify in a 402 hearing. No, no, no. But did she make an offer of proof that she could testify? I don't know how many times I can say it. She didn't – wasn't asked. She didn't say it. She hasn't examined it recently. Gotcha. But if this were a case in which the defendant or someone else was seen running out of the store and there was a doctor who could testify that he was paralyzed in a wheelchair two years earlier – well, did you examine him at the time of the offense? No, but he was paralyzed in a wheelchair two years before. So I don't know how – what his condition was, but usually when you're paralyzed, it's permanent. I think that would be relevant, and I think this was relevant. Thank you. Thank you. Thank you. The case of United States v. – or Drew v. Scribner is submitted. We're adjourned for the morning. Bye-bye. This court is adjourned.
judges: Siler McKeown, Bea